BRYSON, Circuit Judge,
concurring in part and dissenting in part:
I concur with the portions of this court’s judgment that are directed to standing, the patentability of the cDNA claims, and the patentability of the method claims. I respectfully dissent, however, from the court’s holding that Myriad’s BRCA gene claims and its claims to gene fragments are patent-eligible. In my view, those claims are not directed to patentable subject matter, and if sustained the court’s decision will likely have broad consequences, such as preempting methods for whole-genome sequencing, even though Myriad’s contribution to the field is not remotely consonant with such effects.
In its simplest form, the question in this case is whether an individual can obtain patent rights to a human gene. From a common-sense point of view, most observers would answer, “Of course not. Patents are for inventions. A human gene is not an invention.” The essence of Myriad’s argument in this case is to say that it has not patented a human gene, but something quite different — an isolated human gene, which differs from a native gene because the process of extracting it results in changes in its molecular structure (although not in its genetic code). We are therefore required to decide whether the process of isolating genetic material from a human DNA molecule makes the isolated genetic material a patentable invention. The court concludes that it does; I conclude that it does not.
At the outset, it is important to identify the inventive contribution underlying Myriad’s patents. Myriad was not the first to map a BRCA gene to its chromosomal location. That discovery was made by a team of researchers led by Dr. Mary-Claire King. See Jeff M. Hall et al., Linkage of Early-Onset Familial Breast Cancer to Chromosome 17q21, 250 Science 1684 (1990). And Myriad did not invent a new method of nucleotide sequencing. Instead, it applied known sequencing techniques to identify the nucleotide order of the BRCA genes.[1] Myriad’s discovery of those sequences entailed difficult work, and the identified sequences have had important applications in the fight against breast cancer. But the discovery of the sequences is an unprotectable fact, just like Dr. King’s discovery of the chromosomal location of the BRCA1 gene.
Of course, Myriad is free to patent applications of its discovery. As the first party with knowledge of the sequences, Myriad *1374 was in an excellent position to claim applications of that knowledge. Many of its unchallenged claims are limited to such applications. See, e.g., '441 patent, claim 21; '492 patent, claim 22; '282 patent, claim 9. Yet some of Myriad’s challenged composition claims effectively preempt any attempt to sequence the BRCA genes, including whole-genome sequencing. In my view, those claims encompass unpatentable subject matter, and a contrary ruling is likely to have substantial adverse effects on research and treatment in this important field.
I
As the majority and concurring opinions explain, the claims at issue in this case fall into three categories: claims that cover the isolated BRCA genes (claim 1 of the '282 patent, claim 1 of the '473 patent, and claims 1 and 6 of the '492 patent); claims that cover only the BRCA cDNA (claims 2 and 7 of the '282 patent and claim 7 of the '492 patent); and claims that cover portions of the BRCA genes and cDNA as small as 15 nucleotides long (claims 5 and 6 of the '282 patent). I first address the claims to the BRCA genes.
A
In the seminal case of Diamond v. Chakrabarty, 447 U.S. 303, 100 S.Ct. 2204, 65 L.Ed.2d 144 (1980), the Supreme Court held that an artificial life form could be patented. In the course of its opinion, and critically for purposes of its reasoning, the Court stated that not all living things or other items found in nature were subject to patenting. The Court explained that although the language of section 101 of the Patent Act is broad, it is not the case that it “has no limits or that it embraces every discovery.” Id. at 309, 100 S.Ct. 2204. The Court then set forth the general proposition that “laws of nature, physical phenomena, and abstract ideas have been held not patentable.” Id. As examples, the Court noted that “a new mineral discovered in the earth or a new plant found in the wild is not patentable subject matter.” Thus, even though a mineral or a plant is a “composition of matter,” and could be viewed as falling within a broad construction of section 101, the Court explained that those “manifestations of ... nature” are not patentable subject matter, but are “free to all men and reserved exclusively to none.” Id., quoting Funk Bros. Seed Co. v. Kalo Inoculant Co., 333 U.S. 127, 130, 68 S.Ct. 440, 92 L.Ed. 588 (1948); see also Bilski v. Kappos, — U.S. —, 130 S.Ct. 3218, 3225, 177 L.Ed.2d 792 (2010).
The Court in Chakrabarty held the artificial life form at issue in that case to be patentable because the claim was “not to a hitherto unknown natural phenomenon, but to a nonnaturally occurring manufacture or composition of matter — a product of human ingenuity ‘having a distinctive name, character [and] use.’ ” Id. at 309-10, 100 S.Ct. 2204, quoting Hartranft v. Wiegmann, 121 U.S. 609, 615, 7 S.Ct. 1240, 30 L.Ed. 1012 (1887). In distinguishing between naturally occurring substances and nonnaturally occurring manufactures, the Court relied heavily on its earlier decision in Funk Brothers, in which the inventor discovered that certain useful bacterial strains did not exert an inhibitive effect on each other. Based on that discovery, the inventor obtained a patent on a mixed culture of those non-inhibitive strains. The Supreme Court held the product unpatentable, however, because the bacteria remained structurally and functionally the same as in their natural state. Funk Bros., 333 U.S. at 131, 68 S.Ct. 440. By contrast, because Chakrabarty had produced “a new bacterium with markedly different characteristics from any found in nature and one having the potential for significant utility,” the Court held Chakrabarty’s invention to be patentable. Chakrabarty, 447 U.S. at 310, 100 S.Ct. 2204.
*1375 B
Myriad’s claims to the isolated BRCA genes seem to me to fall clearly on the “unpatentable” side of the line the Court drew in Chakrabarty. Myriad is claiming the genes themselves, which appear in nature on the chromosomes of living human beings. The only material change made to those genes from their natural state is the change that is necessarily incidental to the extraction of the genes from the environment in which they are found in nature. While the process of extraction is no doubt difficult, and may itself be patentable, the isolated genes are not materially different from the native genes. In this respect, the genes are analogous to the “new mineral discovered in the earth,” or the “new plant found in the wild” that the Supreme Court referred to in Chakrabarty. It may be very difficult to extract the newly found mineral or to find, extract, and propagate the newly discovered plant. But that does not make those naturally occurring items the products of invention.
The same is true for human genes. Like some minerals, they are hard to extract from their natural setting. Also like minerals, they can be used for purposes that would be infeasible if they remained in their natural setting. And the process of extracting minerals, or taking cuttings from wild plants, like the process of isolating genetic material, can result in some physical or chemical changes to the natural substance. But such changes do not make extracted minerals or plant cuttings patentable, and they should not have that effect for isolated genes. In each case, merely isolating the products of nature by extracting them from their natural location and making those alterations attendant to their extraction does not give the extractor the right to patent the products themselves.
The majority characterizes the isolated genes as “new molecules” and considers them different substances from the corresponding native DNA.[2] Because the native BRCA genes are chemically bonded to other genes and histone proteins, the majority concludes that cleaving those bonds to isolate the BRCA genes turns the isolated genes into “different materials.” Yet there is no magic to a chemical bond that requires us to recognize a new product when a chemical bond is created or broken, but not when other atomic or molecular forces are altered.[3] A chemical bond is merely a force between two atoms or groups of atoms strong enough “to make it convenient for the chemist to consider [the aggregate] as an independent molecular species.” Linus Pauling, The Nature of the Chemical Bond 6 (3d ed.1960). Weaker interatomic forces will be broken when, for example, a dirty diamond is cleaned with water or another solvent, but that does not make the clean diamond a human-made invention. See Am. Fruit Growers, Inc. v. Brogdex Co., 283 U.S. 1, 12, 51 S.Ct. 328, 75 L.Ed. 801 (1931) (cleaning a shell by acid and then grinding off a layer with *1376 an emery wheel did not convert it into a different product). Nor should it make a difference for purposes of patentability if the portion of a wild plant that is collected for purposes of later regeneration is separated from the original plant by chemical means or by scissors.
Although the majority insists that the changes in the DNA molecule that occur as part of the process of isolation render the gene claims patentable, the majority does not appear to take a similar position with respect to chemical elements. The government as amicus curiae argues that patenting the BRCA genes would be like patenting the element lithium. Isolated lithium does not occur naturally because it reacts with air and water and thus is found in nature only as part of a chemical compound, ionically bound to other elements. Robert E. Krebs, The History and Use of Our Earth’s Chemical Elements 48 (2d ed.2006). Once isolated, lithium has many industrial applications, and in order to isolate lithium, it is necessary to break ionic bonds in the lithium compounds that are found in nature. But the majority acknowledges that elemental lithium (like other elements) would not be patentable subject matter because it “is the same element whether it is in the earth or isolated.”
The principles underlying that analysis apply to genetic material as well. In order to isolate the BRCA gene, it is necessary to break chemical bonds that hold the gene in its place in the body, but the genetic coding sequence that is the subject of each of the BRCA gene claims remains the same whether the gene is in the body or isolated. The majority, however, does not agree that the cases are analogous, and indeed appears to have adopted the following rule: Isolated atoms are not patent eligible, but isolated molecules are.
Apart from the arbitrariness of such a rule, if we are to apply the conventional nomenclature of any field to determine whether Myriad’s isolated DNA claims are “new,” it would seem to make more sense to look to genetics, which provides the language of the claims, than to chemistry. Aside from Myriad’s cDNA claims, its composition claims are not defined by any particular chemical formula. For example, claim 1 of the '282 patent covers all isolated DNAs coding for the BRCA1 protein, with the protein being defined by the amino acid sequence encoded by the naturally occurring BRCA1 gene. From a molecular perspective, that claim covers a truly immense range of substances from the cDNA that is 5,914 nucleotides long to the isolated gene that contains more than 120,-000 nucleotides. And the patent does not define the upper end of that range because the patent does not identify a unique nucleotide sequence for the 120,000-nucleo-tide-long isolated BRCA1 gene. Instead, the patent contains a sequence that is just 24,000 nucleotides long with numerous gaps denoted “wwvwwww.” '282 patent, fig. 10. An almost incalculably large number of new molecules could be created by filling in those gaps with almost any nucleotide sequence, and all of those molecules would fall within the scope of claim 1. Included in that set are many important molecular variations to the BRCA1 gene that Myriad had not yet discovered and could not have chemically described. Yet those molecules would share only one unifying characteristic: each codes for the same protein as the naturally occurring BRCA1 gene.
From a genetic perspective, that claim covers one “composition of matter” — the BRCA1 gene. The isolated BRCA genes are identical to the BRCA genes found on chromosomes 13 and 17. They have the same sequence, they code for the same proteins, and they represent the same units of heredity. During the transcription phase of protein synthesis, the BRCA *1377 genes are separated from chromosomal proteins. The transcription process then proceeds from a starting point called the promoter to a stopping point often called the terminator. James D. Watson et al., Molecular Biology of the Gene 382, 394-96 (6th ed.2008). The only difference between the naturally occurring BRCA genes during transcription and the claimed isolated DNA is that the claimed genes have been isolated according to nature’s predefined boundaries, i.e., at points that preserve the ability of the gene to express the protein for which it is coded.
In that respect, extracting a gene is akin to snapping a leaf from a tree. Like a gene, a leaf has a natural starting and stopping point. It buds during spring from the same place that it breaks off and falls during autumn. Yet prematurely plucking the leaf would not turn it into a human-made invention. See Intervet Inc. v. Merial Ltd., 617 F.3d 1282, 1295 (Fed. Cir.2010) (Dyk, J., concurring in part and dissenting in part). That would remain true if there were minor differences between the plucked leaf and the fallen autumn leaf, unless those differences imparted “markedly different characteristics” to the plucked leaf. Chakrabarty, 447 U.S. at 310, 100 S.Ct. 2204.
Both the majority and the concurring opinions attach significant weight to the fact that the claimed coding portions of the native BRCA genes are part of a much larger molecule and that the isolated BRCA genes, being smaller molecules extracted from the larger one, are therefore man-made inventions. But to argue that the isolated BRCA gene is patentable because in its native environment it is part of a much larger structure is no more persuasive than arguing that although an atom may not be patentable, a subatomic particle is patentable because it was previously part of a larger structure, or that while a tree is not patentable, a limb of the tree becomes a patentable invention when it is removed from the tree.
Of course, it is an over-simplification to say that something that can be characterized as “isolated” or “extracted” from its natural setting always remains a natural product and is not patentable. One could say, for example, that a baseball bat is “extracted” or “isolated” from an ash tree, but in that case the process of “extracting” the baseball bat necessarily changes the nature, form, and use of the ash tree and thus results in a manmade manufacture, not a naturally occurring product. In that setting, man has defined the parts that are to be retained and the parts that are to be discarded. The result of the process of selection is a product with a function that is entirely different from that of the raw material from which it was obtained. In the case of the BRCA genes, by contrast, nature has defined the genes as independent entities by virtue of their capacity for protein synthesis and, ultimately, trait inheritance. Biochemists extract the target genes along lines defined by nature so as to preserve the structure and function that the gene possessed in its natural environment. In such a case, the extraction of a product in a manner that retains the character and function of the product as found in nature does not result in the creation of a human invention.[4] That principle was captured by the Supreme Court’s statement in Chakrabarty that the invention in that case was not to “a hitherto unknown natural phenomenon, but to a nonnaturally *1378 occurring manufacture or composition of matter ‘having a distinctive name, character [and] use.’ ” 447 U.S. at 309-10, 100 S.Ct. 2204.
Cases involving the “purification” of a natural substance employ similar analysis. Our predecessor court recognized that merely purifying a naturally occurring substance does not render the substance patentable unless it results in a marked change in functionality. In re Merz, 25 CCPA 1314, 97 F.2d 599, 601 (1938) (holding that there was no right to a patent on a purer version of ultramarine, but recognizing that if a claimed article is “of such purity that it differs not only in degree but in kind it may be patentable”); see also In re King, 27 CCPA 754, 107 F.2d 618, 620 (1939) (same, for purified vitamin C); In re Marden, 18 CCPA 1057, 47 F.2d 958, 959 (1931) (same, for purified vanadium); Gen. Elec. Co. v. DeForest Radio Co., 28 F.2d 641, 643 (3d Cir.1928) (same, for purified tungsten). On the other hand, the purified natural substance is patentable if the “purification” results in a product with such distinct characteristics that it becomes “for every practical purpose a new thing commercially and therapeutically.” Parke-Davis & Co. v. H.K Mulford Co., 189 F. 95, 103 (C.C.S.D.N.Y.1911); see also Merck & Co. v. Olin Mathieson Chem. Corp., 253 F.2d 156, 161-64 (4th Cir.1958) (holding that a purified composition of vitamin B-12 was patentable because the purification process resulted in a product that was therapeutically effective, whereas the natural form was not).
In sum, the test employed by the Supreme Court in Chakrabarty requires us to focus on two things: (1) the similarity in structure between what is claimed and what is found in nature and (2) the similarity in utility between what is claimed and what is found in nature. What is claimed in the BRCA genes is the genetic coding material, and that material is the same, structurally and functionally, in both the native gene and the isolated form of the gene.
The structural differences between the claimed “isolated” genes and the corresponding portion of the native genes are irrelevant to the claim limitations, to the functioning of the genes, and to their utility in their isolated form. The use to which the genetic material can be put, i.e., determining its sequence in a clinical setting, is not a new use; it is only a consequence of possession. In order to sequence an isolated gene, each gene must function in the same manner in the laboratory as it does in the human body. Indeed, that identity of function in the isolated gene is the key to its value. Moreover, as Judge Moore’s concurring opinion explains, Myriad has failed to credibly identify new uses for the isolated BRCA genes as probes or primers. The naturally occurring genetic material thus has not been altered in a way that would matter under the standard set forth in Chakrabarty. For that reason, the isolation of the naturally occurring genetic material does not make the claims to the isolated BRCA genes patent-eligible.
II
As noted, in addition to the BRCA gene claims discussed above, the claims at issue in this appeal include four claims to BRCA cDNA and two claims to portions of the BRCA genes and cDNA as small as 15 nucleotides long.
I agree with the court that the claims to BRCA cDNA are eligible for patenting. The cDNA cannot be isolated from nature, but instead must be created in the laboratory.[5] Although that process occurs with *1379 natural machinery, the end product is a human-made invention with distinct structure because the introns that are found in the native gene are removed from the cDNA segment. Additionally, the cDNA has a utility not present in the naturally occurring BECA DNA and mRNA because cDNA can be attached to a promoter and inserted into a non-human cell to drive protein expression.
However, I disagree with the court as to the two claims to short segments of DNA having at least 15 nucleotides. Claim 6 of the '282 patent covers any sequence of the BRCA1 cDNA that is at least 15 nucleotides long. That claim encompasses each BRCA1 exon, even though each exon is naturally defined by transcription. Moreover, because small sequences of DNA are repeated throughout the three billion nucleotides of the human genome, the claim covers portions of the cDNA of more than 4% of human genes. It also covers portions of the DNA of nearly all human genes. Accordingly, efforts to sequence almost any gene could infringe claim 6 even though Myriad’s specification has contributed nothing to human understanding of other genes.
Myriad could easily have claimed more narrowly to achieve the utility it attaches to segments of cDNA. It contends that those segments can be used as probes and primers. DNA probes must be chemically altered or “tagged” before they can be so used, and Myriad could have claimed the tagged segments to achieve probe functionality. A claim to tagged segments would not encompass the BRCA1 exons. As to primer functionality, many of the cDNA segments will not work. Some will be too long. Some will be too short. Some will be palindromic and fold in on themselves. Myriad could have identified a subset of the segments that work as primers, and such a claim could be patentable if it were limited to species with “markedly different characteristics from any found in nature and ... having the potential for significant utility.” Chakrabarty, 447 U.S. at 310, 100 S.Ct. 2204. The problem with claim 6 is that it is so broad that it includes products of nature (the BRCA1 exons) and portions of other genes; its validity is not salvaged because it includes some species that are not natural. Accordingly, I would hold claim 6 unpatentable.
Myriad’s last claim, claim 5 of the '282 patent, is breathtakingly broad. That claim covers any segment of the DNA defined by claim 1, provided that the segment is at least 15 nucleotides long. Claim 1, in turn, covers any isolated DNA that codes for the BRCA1 polypeptide. Thus, claim 5 would cover not only the isolated BRCA1 gene in each of its untold molecular variations, but also any sub-sequence of those molecules, including portions that fall in the undefined range of those molecules denoted “vwwwwww.” Claim 5 would therefore be unpatentable for the same reasons as claim 1 and claim 6.
Of course, in light of its breadth, claim 5 of the '282 patent is likely to be invalid on other grounds, and thus a ruling as to patent-eligibility with respect to that claim may be superfluous. Nonetheless, it is important to consider the effects of such broad patent claims on the biotechnology industry. While Myriad has emphasized the biotechnology industry’s need of patent protection to encourage and reward research in this difficult and important field, there is another side to the coin. Broad claims to genetic material present a signifi *1380 cant obstacle to the next generation of innovation in genetic medicine — multiplex tests and whole-genome sequencing. New technologies are being developed to sequence many genes or even an entire human genome rapidly, but firms developing those technologies are encountering a thicket of patents. Secretary’s Advisory Comm, on Genetics, Health, and Society, Dep’t of Health & Human Servs., Gene Patents and Licensing Practices and Their Impact on Patient Access to Genetic Tests 49-62 (2010). In order to sequence an entire genome, a firm would have to license thousands of patents from many different licensors. See id. at 50-51. Even if many of those patents include claims that are invalid for anticipation or obviousness, the costs involved in determining the scope of all of those patents could be prohibitive. See id. at 51-52; Rebecca S. Eisenberg, Noncompliance, Nonenforcement, Nonproblem? Rethinking the Anticommons in Biomedical Research, 45 Hou. L.Rev. 1059, 1076-1080 (2008) (concluding that existing studies “have focused relatively little attention on downstream product development” and that interviews accompanying those studies suggest that, though smaller than initially feared, the costs associated with the patent thicket are “quite real in the calculations of product-developing firms”). In light of these considerations, this may well be one of those instances in which “too much patent protection can impede rather than ‘promote the Progress of Science and useful Arts.’ ” Lab. Corp. of Am. Holdings v. Metabolite Labs., Inc., 548 U.S. 124, 126, 126 S.Ct. 2921, 165 L.Ed.2d 399 (2006) (Breyer, J., dissenting from dismissal of writ as improvidently granted).
My colleagues assign significant weight to the fact that since 2001 the PTO has had guidelines in place that have allowed patents on entire human genes. They conclude that those guidelines, and the PTO’s earlier practice, are entitled to deference from this court as to the question whether patents to isolated human genes constitute patent-eligible subject matter. I think the PTO’s practice and guidelines are not entitled to significant weight, for several reasons.
First, as we have recognized, the PTO lacks substantive rulemaking authority as to issues such as patentability. Animal Legal Def. Fund v. Quigg, 932 F.2d 920, 930 (Fed.Cir.1991). In areas of patent scope, we owe deference only commensurate with the “the thoroughness of its consideration and the validity of its reasoning.” Merck & Co. v. Kessler, 80 F.3d 1543, 1550 (Fed.Cir.1996). The comments that the PTO issued at the time of its 2001 guidelines in response to suggestions that isolated human genes were not patentable are, frankly, perfunctory. See John M. Conley & Roberte Makowski, Back to the Future: Rethinking the Product of Nature Doctrine as a Barrier to Biotechnology Patents, 85 J. Pat. & Trademark Off. Soc’y 301 (2003). Because those comments, at least on their face, do not reflect thorough consideration and study of the issue, I do not regard them as worthy of much weight in the analysis of this complex question.
Second, whatever force the PTO’s views on the issue of patent eligibility may have had in the past has, at the very least, been substantially undermined by the position the government has taken in this case. The Department of Justice filed a brief on behalf of the United States in this court taking the position that Myriad’s gene claims (other than the cDNA claims) are not patent-eligible. Although the PTO did not “sign” the brief and we are left to guess about the status of any possible continuing interagency disagreements about the issue, the Department of Justice speaks for the Executive Branch, and the PTO is part of the Executive Branch, so it is fair to assume that the Executive Branch has modified its position from the *1381 one taken by the PTO in its 2001 guidelines and, informally, before that.
Finally, prior to the Supreme Court’s decision in Chakrabarty, the PTO had determined that microorganisms were not subject to patenting, but the Supreme Court gave no indication that it regarded that view as entitled to deference. Moreover, the Court gave short shrift to the Commissioner’s contention (which was made the lead argument in its brief) that the patentability of life-forms was an issue that should be left to Congress. Citing Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), the Court explained that “Congress has performed its constitutional role in defining patentable subject matter in § 101; we perform ours in construing the language Congress has employed.” Chakrabarty, 447 U.S. at 315, 100 S.Ct. 2204. We have the same responsibility and should not shy away from deciding the issues of law that the parties have brought to us. Although my colleagues believe our analysis of the legal question in this case should be influenced by purported expectations of the inventing community based on the PTO’s past practice of issuing patents on human genes, that is in effect to give the PTO lawmaking authority that Congress has not accorded it.[6] There is no collective right of adverse possession to intellectual property, and we should not create such a right. Our role is to interpret the law that Congress has written in accordance with the governing precedents. I would do so and would affirm the district court’s rulings as to the BRCA gene and BRCA gene segment claims.

. There is some dispute over whether other inventors helped Myriad discover the BRCA sequences or discovered the BRCA2 sequence before Myriad. Because those disputes are irrelevant to the question of patentable subject matter, I refer to the discovery of the BRCA sequences as Myriad’s work.

. The majority characterizes the question in this case as turning on the breaking of covalent bonds linking the BRCA genes to the rest of the DNA in chromosomes 13 and 17, but its analysis appears to place patentable weight on the breaking of other chemical bonds, such as the hydrogen bonds that are broken when separating DNA from histones or — in an example unrelated to this case — the ionic bonds that are broken when lithium is derived from a salt. It is difficult to see why differences between types of chemical bonds should matter for patentability purposes, and I see little support for such a distinction in the governing precedents.

. By analogy, extracting a slab of marble from the earth does not give rise to protectable intellectual property rights, but “extracting” a piece of sculpture from that slab of marble does. In the case of the BRCA gene claims, what Myriad has claimed is more akin to the slab of marble found in the earth than to the sculpture carved from it after its extraction.

. The appellees argue that the BRCA1 cDNA can be isolated from nature, and they refer to a BRCA1 pseudogene called BRCA1P1 that is found in the human genome. However, the *1379 appellees have failed to demonstrate that the pseudogene consists of the same sequence as the BRCA1 cDNA.

. Because the asserted reliance interest is based on PTO practice and not on prior judicial decisions, this case is not analogous to Warner-Jenkinson Co. v. Hilton Davis Chemical Co., 520 U.S. 17, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997), or Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 535 U.S. 722, 122 S.Ct. 1831, 152 L.Ed.2d 944 (2002), where the expectations of the inventing community were based on longstanding Supreme Court precedent.